The INSURANCE COMPANY OF TEXAS,
Appellant,

v.

I. M. SIDES, Appellee.

No. 6489.

Court of Civil Appeals of Texas.

Amarillo.

April 18, 1955.

Rehearing Denied May 16, 1955.

Klett, Bean & Evans and Trout & Jones, Lubbock, for appellant.

R. H. Munsterman, Levelland, and Bob Huff, Lubbock, for appellee.

MARTIN, Justice.

The appellant, The Insurance Company of Texas, being dissatisfied with the award made by the Industrial Accident Board to appellee, I. M. Sides, awarding 10 weeks of total disability followed by 300 weeks of partial disability, appealed such award to the District Court of Hockley County, Texas. Appellee filed his cross-action in such cause of action seeking recovery for total and permanent disability. On a trial before a jury, appellee recovered judgment for total and permanent disability. Appellant appealed from such judgment and assigns eight points of error.

Appellee, I. M. Sides, contends that he was injured while working with a track or circle jack while breaking apart a bit and joints of drill stem on a well-drilling rig. The circle or track jack is built in a semicircle about seven feet in diameter and made to lie flat on the ground. A series of notches runs from one end of the jack to the other, similar to the notches on a bumper jack except that a circle jack lies flat on the ground rather than up and down. Wrenches are placed on either side of the drill stem and drill bit to be broken apart and then the wrenches are fastened to the circle jack; by working the jack handle back and forth, one notch at a time, around the semi-circle, the drill bit can be tightened or loosened from the drill stem. The testimony is undisputed that each time the jack handle was moved, it moved a total of about one inch at the bottom, a notch at a time, and moved through an arc of about 18 inches to 2 feet at the top.

Appellee testified that while working this jack handle back and forth and while he was pushing on the handle, the drill stem suddenly came loose allowing him to go forward 12 to 18 inches. He claims that this sudden loosening of the bit from the joint of pipe fractured his fifth lumbar vertebra in three places, damaged two intervertebral discs and broke the attachments of the fifth lumbar vertebra to the first sacral vertebra.

B. L. Breed, appellee's employer, was working with the appellee at the time the alleged injury was supposed to have occurred and was pulling on the jack handle. He was facing the appellee and within a distance of two to three feet of appellee, who was pushing on the jack handle on the opposite side facing Breed. Breed testified there was no sudden jerking or slipping of the jack handle and there was nothing unusual that happened while he and appellee were using the jack handle; that they simply worked the handle back and forth until the bit was unscrewed from the joint of pipe and that appellee made no out-cry and gave no indication he was injured. Breed further testified as to the alleged sudden break in the joint between the pipe and bit "It didn't break out suddenly". The testimony of appellee corroborates B. L. Breed on the principal facts other than the fact that the joints did not break out suddenly.

■ Appellant's points four and five will be discussed first as such points reflect error. Point four alleges that the trial court erred in admitting testimony that the employer, B. L. Breed, filed with the Industrial Accident Board an "Employer's First Report of Injury". Point five alleges that the trial court erred in admitting evidence concerning the contents of the "Employer's First Report of Accident" filed with the Industrial Accident Board. Briefly, the record under these points reflects that the attorney for appellee examined B. L. Breed with reference to his filing of the report of appellee's injury with the Industrial Accident Board—which report was made on the 22nd day of October. B. L. Breed was shown the report and questioned as to whether his signature was on the instrument, as to the date of the same and further whether appellee's signature was on the same and as to the making of the report. The issue of whether appellee was injured while working for Breed was strongly contested. Attorney for appellee alleged the following reason for admission of the report of the injury filed with the Industrial Accident Board and cross-examination of Breed as to the same:

"Where it is made admissable, your Honor, is to show that he made a report immediately, he didn't wait any week or until he got down to the hospital, he made the report and sent it to the board showing he was hurt and how he got hurt on the job and that certainly is—".

The court permitted the appellee to show that Breed made a report and the date of it. Appellant repeatedly objected on the grounds that the report was strictly excluded by statute and could not be entered in evidence and that the attorneys were not permitted to go into the contents of such report. The action of appellee's attorney in showing Breed the report in the presence of the jury and cross-examining him in regard to whether he signed the same and like matters was clearly error and requires a reversal of the case unless rendered harmless by the issues asserted in appellee's brief as hereinafter discussed. The fact that appellee seeks to show such error was cured or was harmless error is a tacit admission that it was error to permit Breed to be cross-examined with reference to the filing of the report and any matters pertaining thereto. Article 8309, Section Five, Vernon's Annotated Civil Statutes; Liberty Mutual Ins. Co. v. Boggs, Tex. Civ.App., 66 S.W.2d 787, Syl. 20; Employers' Casualty Co. v. Watson, Tex. Civ.App., 32 S.W.2d 927, Syl. 4; Yates v. Pacific Indemnity Company, Tex.Civ. App., 193 S.W.2d 266, Syl. 4; Maryland Casualty Co. v. Davis, Tex.Civ.App., 181 S.W.2d 107, Syl. 2; Williams v. Texas Employers Insurance Association, Tex. Civ.App., 226 S.W.2d 152.

Since the procedure outlined above clearly constituted error, the record will now be examined as to whether such error was cured or rendered harmless by the matters asserted by appellee under his counter-points four and five. These matters will be dealt with as numbered in appellee brief in the following paragraphs.

Appellee alleged "(1) This testimony was proper to show that the appellee's employer knew of appellee's injury immediately, rather than long after the appellee had been in the hospital as the employer had testified". This allegation points up the most flagrant aspect of the violation of the rights of the appellant. In answer to cross-examination by appellee's attorney as to making a report of the injury to the Industrial Accident Board, Breed testified:

"A. Not till, not till after he was down there in the hospital."

As pointed out hereinabove, attorney for appellee contended that the report of the injury was admissible to impeach Breed by proving:

"he made a report immediately, he didn't wait any week or until he got down to the hospital * * *".

On this issue, appellee's attorney wholly disregarded the fact that the record fully corroborated Breed on his testimony above quoted. The appellee himself testified that on the morning following the purported accidental injury, that he went to Dr. Sharpe at the hospital and that Sharpe:

"* * * made some x-rays, and then immediately put me to bed.

"Q. There in the hospital? A. Yes, sir.

"Q. About how long were you in in hospital? A. I was there five or six days."

The undisputed testimony of the appellee reveals there wasn't any lapse of a week or appreciable length of time before appellee "got down to the hospital". Appellee went almost immediately from the job to confinement in the hospital. Breed testified that he went down to the hospital and filed the report and the report was dated the 22nd day of October. The alleged injury was supposed to have occurred on October 20th. Therefore, Breed was wholly corroborated, beyond

any basis for dispute, that he did go down to the hospital and make a report. It is apparent there is no merit at all to appellee's theory No. 1 that the report was admissible to impeach Breed as to his statement that he made a report of the accident "after he (appellee) was down there in the hospital." This issue has been developed fully as it reveals that appellee's reason as initially given for the introduction of the report merely served to set up a straw man to be knocked down in the absence of a valid issue of any kind. Nor was it even material as a matter of law whether a report was made immediately or weeks later.

▪ Appellee next alleged that "appellant waived any error therein by its failure to object until long after such testimony had been put into the record". The record reveals that appellant's counsel did object and seek to keep the report out of the record. Counsel also objected to the employer, Breed, being cross-examined in the presence of the jury as to the contents of the report. And counsel also made the following objection on the issue:

"It doesn't do me any good to object to the court if Mr. Huff is going to get up and testify about what he thinks might be in the report or what this man did. We object to his remark, and to this testimony".

The record reveals the exception of the counsel duly made upon the court permitting appellee to cross-examine Breed and show whether or not he made the report and the date of it. There is no merit to the second allegation shown in appellee's counterpoints four and five as objection was duly made and an exception saved.

▪ Appellee's next allegation in his counter-points four and five is that "(2) the appellant agreed that this testimony, or similar testimony, could be introduced into the record of this cause and any purported error therein was waived by the appellant and further (3) any purported error therein would be harmless error." These two issues will be treated together. It is noted from the record that, in the absence of the jury, counsel for appellee introduced a series of questions and answers and also tendered in evidence the report in theoretically seeking to impeach the employer, Breed, on an immaterial issue. The record likewise reflects that counsel for appellant did make the following statement as quoted in appellee's brief.

"If the Court please, we are perfectly willing that Mr. Breed undergo any additional cross examination that Mr. Huff is making. I didn't make any objections to any of those questions and I don't believe the Court excluded all that testimony. The only thing the Court excluded as I recall is that report to Industrial Accident Board which the statute excludes. Mr. Huff wants to cross examine him some more, I'm making no objections to the questions that were asked".

However, it must be observed that additional matters to the above quotation in appellee's brief are revealed by the record on this specific subject. The record further reveals immediately following the above quotation, these additional facts:

"Mr. Huff: If you have no objections we will just let the reporter read them back to the jury. (Argument pro and con)"

The nature of the argument pro and con is not revealed but its context clearly had some influence on counsel for appellee's further pursuit of the subject.

Following the above procedure, the report to the Industrial Accident Board was not introduced in evidence and attorney for appellee further stated:

"I am just going to propound those four questions that we were talking about".

Since the questions actually propounded by appellee's counsel and the answers as made thereto by Breed are material to the issue here, they will be quoted and discussed at the expense of brevity.

"By Mr. Huff: Q. Just to make it as fast as we can, Mr. Breed, you do admit that Mr. Sides was injured in the course of his employment out there on the job doing what he was paid to do, you admit that, don't you? A. That's where he—that's where he commenced complaining.

"Q. And you admit that statement, you've always—you've never denied it, have you? A. No, sir.

"Q. And you signed a *typewritten statement typed up by that adjuster for the insurance company* setting out those very things, didn't you? A. Him and —him and me. He's in the bed down there, him and me both made out that *report to the adjuster*.

"Q. And you have never denied him getting hurt out there on the job, to any living human, have you? A. No, sir.

\* .\* \* \* \*. \*

"Q. All right. And that was all done there on the *22nd up there in the hospital room?* A. Well, I don't remember whether it's the 22nd or just what the date was on it, but it was down there in the hospital room.

"Q. That's—Thank you a lot, sir, Mr. Breed, and that's all." (Italics added.)

The record reveals no objection to the above questions and answers and it is apparent from such record that the instrument in issue in the above cross-examination was a "typewritten statement typed up by that adjuster for the insurance company". Although included in the Statement of Facts, the report to the Industrial Accident Board now in issue was not introduced as a part of this record and there is no evidence that such form was "typed up by that adjuster" nor can such fact be presumed. If any presumption were to be indulged it would appear more reasonable that the report was on a standard printed form. The above testimony and facts in this record do not reveal that appellant's attorney agreed that Breed could be cross-examined as to the report of Mr. Breed to the Industrial Accident Board or that such an examination finally occurred by agreement in the light of the above testimony.

The cross-examination of Breed as to the report being made to the Industrial Accident Board not only constitutes error but the record reveals that the entire procedure seeking to inject the "Employer's First Report of Injury" and as to the filing of such with the Industrial Accident Board was based on a wholly false premise. The undisputed record reveals, and it was finally tacitly admitted by counsel for appellee, that Breed was not telling an untruth as to any fact. Breed's verity is established by the entire record and also by the following statement of counsel for appellee as made in his closing argument:

"\* \* \* you could see Mr. Breed wanted to be fair, and I say this, I don't believe that gentleman deliberately told an untruth."

The facts finally boil down to the single issue that Breed testified that nothing unusual occurred while he and appellee were working on the jack handle. On this issue, he was corroborated by the appellee himself. The record reflects that the entire matter dealt with hereinabove was an unwarranted attempt to impel Breed to go further than the facts he knew and testify that he knew that the appellee was injured while pushing on the jack handle. The record reveals, without dispute, that all Breed could know as to appellee's asserted injury was that fact verified by appellee himself "—that's where he commenced complaining." The above matter discloses error and the same was harmful error not cured by any element revealed in this record. Appellant's points four and five are sustained.

■ Appellant's point six alleges "The trial court erred in overruling Appellant's objection to the argument by Appellee's counsel Huff to the effect that an adjuster for The Insurance Company of Texas destroyed a portion of the X-ray films offered in evidence." Appellant's point seven alleges "The trial court erred in refusing to

instruct the jury to disregard the arguments made by appellee's counsel Huff to the effect that an adjuster for The Insurance Company of Texas had destroyed a portion of the x-ray films offered in evidence". Appellant's point eight alleges "The argument by appellee's counsel Huff to the jury that an adjuster for The Insurance Company of Texas had attempted to 'get away with' some x-rays from the hospital in Denver was inflammatory and prejudicial, not supported by the record, and was of such a nature that it coud not be cured by an instruction from the Court to the jury to disregard such argument." These three points will be ruled on in the following paragraphs.

The portion of the argument complained of, with objections thereto, will be quoted:

"That's whenever the one armed adjuster got on the horse, and that's when he started conniving. Yes, sir, you talk about inferences, gentlemen.

"Now, what do you see there of an x-ray that was taken from Dr. Sharpe, in the bottom a torn-out place at the very place that the break was supposed to be."

Objection was made to the above argument in that "there is nothing shown that it was torn by anyone connected with the insurance company, and we ask that the jury be instructed not to consider it." There is no evidence in the record revealing when, where or how this torn out place occurred as to the X-ray picture. There is no evidence that the X-ray was taken from Dr. Sharpe but the evidence reveals that it was delivered to the adjuster. The record further reveals that the same was taken to another doctor for examination of the same. Apparently, there was some delay in returning the X-ray. The fact that this argument was wholly prejudicial and inflammatory and without any basis therefor is revealed by the testimony of appellee's own witness, Dr. David Sharpe, who made the X-ray that inferentially had a portion of the same torn out by the "one armed adjuster."

Dr. Sharpe's testimony reveals that it was wholly immaterial as to X-ray being torn.

"After a few weeks, I *repeated these X-rays,* which *again showed* the fractures as listed above, which conclusively proved that this man has a spondylolisthesis." (Emphasis added.)

If the section was actually torn out of the X-ray, it is apparent that appellee was not deprived of any right since another X-ray as taken revealed exactly the same facts according to the testimony of appellee's own witness. The argument was clearly for the purpose of prejudicing and inflaming the jury with the thought that the insurance company had taken the X-rays from Dr. Sharpe and torn them up to prevent appellee from recovering any compensation. The record reveals the correct name of the party designated as "the one armed adjuster".

 Counsel for appellee, in his closing argument, likewise made the following statement:

"I imagine what happened, it's uncontradicted that the adjuster has moved into Denver, and I imagine that, if they caught him down there trying to get away with some of their X-rays, they'd probably give him the 'boot' just like every hospital in the world would do, and they're made."

Counsel for appellant made the following objection to such argument:

"I object to the testimony about what hospitals would do or giving him the 'boot'. We think it is intended to be inflammatory."

Counsel for appellee withdrew this statement upon the objection being made. Thereby, counsel tacitly recognized that the testimony he had given in the final argument was inflammatory and prejudicial. It should be further pointed out that there is not a scintilla of evidence or even an inference that any hospital in Denver caught the adjuster trying to get away with some of their X-rays or that they

would probably give him the "boot". The merits of the case cannot be correctly developed by an argument based solely upon counsel's imagination. The argument should be confined to the facts and testimony should not be first delivered in the closing argument.

The argument discussed in the paragraphs above was inflammatory and prejudicial to the rights of the appellant and requires a reversal of the cause of action. Texas Employers' Ins. Ass'n v. Haywood, Tex.Civ.App., 266 S.W.2d 499, reversed in Tex., 266 S.W.2d 856. Appellant's points six, seven and eight are sustained.

The cause of action must be reversed under the rulings on the points as above outlined. Appellant's points one, two and three raise the issue that there is no evidence to support the jury finding that I. M. Sides sustained accidental injuries in the employment of Breed or that such jury finding is contrary to the overwhelming weight of the evidence. These points will not be ruled on herein in the light of the above action of the court in the thought that the evidence on a retrial will perhaps not be the same. However, the record reveals the rather unique fact that appellee, according to some of the testimony, fractured his vertebrae in three places, damaged to intervertebral discs and dislocated a vertebra but made no outcry or complaint at the time of receiving such injury. The record further reveals that appellee never told his employer, Breed, working on the jack with him at the time of the asserted injury, that he had suffered these severe injuries while working on the jack. Appellee left the well drilling location and went by to visit an uncle (this was denied by the uncle, however) and never mentioned to this uncle that he was injured while operating the circle jack. Appellee's father took him home in an automobile and appellee's injuries were so severe, according to his father's testimony, that any rough places in the road caused appellee suffering and pain. Although appellee's father was up with appellee most of the night and rubbed his back with alcohol and finally saw him placed in the hospital, the record does not reveal by the testimony of the appellee or by the testimony of his father that appellee ever told his father that he received the injuries while working on the circle jack. Appellee's father, although treating appellee throughout the night following the alleged injury, never asked his son how, when or where he received the injury as far as revealed by this record. The record has been examined in detail and the same does not reveal when, where and to whom appellee first revealed that he was injured while operating the circle jack in conjunction with his employer, Breed.

The judgment of the trial court is reversed and the cause is remanded.